Good morning, Your Honours. May it please the Court. My name is Ani Boyajian, appearing on behalf of Petitioner, Mr. Oscar Loya-Leon. I will begin by discussing the Convention Against Torture issue. I am joined at Council's table by Ms. Jane Kaufman, who will be discussing the particularly serious crime determination. We are both supervised law students from Loyola Law School, under the supervision of Ms. Mary Tonego-Ross, who is also present at Council's table. Mr. Loya-Leon is a mentally disabled man from Mexico who has sought to live safely in the United States for over two decades. He has active, visible symptoms of schizophrenia, which make him a target. Immigrants with mental illness seeking removal relief already face significant barriers in navigating the legal system. And due to his severe mental illness, Mr. Loya-Leon was named a Franco class member, and those courts have already acknowledged that he is due extra protection in the courts because of his mental illness. Yet the IJ and the BIA in this case used Mr. Loya-Leon's mental illness against him in deeming him unreliable, even against the backdrop of expert testimony corroborating the abuse he has experienced and will likely suffer in the future. So how did the expert testimony corroborate the abuse that he has experienced? The testimony corroborates that abuse of that kind takes place in Mexico, but how does it corroborate his specific account? So the expert witness in this case testified that he has severe symptoms of schizophrenia, including hallucinations, disruptive behavior, and an inability to coexist in society. And she gave the opinion that he faces a future risk of becoming re-victimized because his return to Mexico will result in a worsening of symptoms. And in doing so, she also opined that Mr. Loya-Leon was likely threatened with death in the past because of his mental disability. But how does she know that? The expert's role in this case was to discuss with Mr. Loya-Leon his disability and his experiences. And what she did here is she parsed out the truth from what he has testified on away from his delusions. And this is precisely the role of an expert in a situation like this. She was a psychologist or a therapist, was that right? She's a licensed clinical social worker whose expertise was mental disabilities and their symptoms. So, the IJ understood her as having said that Mr. Loya-Leon was simply unreliable as to his, whatever he said about what happened to him. Is that what she said? That's precisely what she said. And our argument is that... It's not precisely what she said. She said that he was, you know, in some ways unreliable, that he had to be listened to slowly, and that his medications could affect his recall. But she didn't say that he was, he shouldn't believe anything he said. She said that because Mr. Loya-Leon exhibits general delusionary thinking, what he has testified on could not be relied on in his TAP claim, which... to figure out as between, given what he said, which were delusionary and which were likely reliable or true. Is that what she was trying to do? Precisely. So, the expert... She wasn't saying that when he said that he was, you know, beaten in the prison, that he made that up. Or that he wasn't to be relied on for that. No. What the IJ said here was that because Mr. Loya-Leon has general delusionary thinking, what he has testified on is not relevant to his TAP claim. Everything he says is unreliable, he said, right? Sorry, would you repeat? He said that everything he said was not to be relied upon. Well, actually, the IJ relied on one minor purported inconsistency here. And also, because Mr. Loya-Leon has general delusionary thinking, held that the expert testimony should be discredited, which is what we argue is error here, because even taking... Even if the court does not believe what the expert has testified on about the past harm, the main inquiry of CAT is the likelihood of future torture. And that's precisely what the expert testified on, is that Mr. Loya-Leon has severe mental illness, schizophrenia, and that his symptoms upon removal to Mexico will only worsen because he has not had the adequate treatment and care. And what the IJ didn't do is consider the country conditions evidence as well as the expert testimony in conjunction. And if the IJ had done so, it would have been... It's nearly certain that Mr. Loya-Leon will face future torture. Let me ask you this. We know that... Well, he testified too, and it appears that the expert, Ms. Gullo, believed him on this point, and for the purpose of my question, I do believe him on this point, that a gang threatened him with death, recruited him, and forced him to hand over land and his house. That seems to have been now a completed transaction. I'm not sure I see anything on the record that suggests to me that that gang's going to go after him again, because he's given them everything he has. But he is threatened with some real harm because of his schizophrenia. Is there anything in this record that tells us he's any more likely to be harmed because of his schizophrenia than any other person who has severe schizophrenia comparable to his? Indeed. So we know that Mr. Loya-Leon has been targeted in the past because of his mental illness. Now, what form did that targeting take? Sorry, would you repeat? You said he'd been targeted in the past because of his mental illness. What form did that take? Are you speaking of something other than the extortion of the land and the house? So he's faced torture from both criminal organizations who have targeted him because of his mental disability and taken his property, and additionally police authorities who have arrested him for vagrancy and then stripped him of his clothing and beat him to the point where he could not walk. So we know that he has been targeted because of his mental disability. He has been visible to these criminal organizations and police authorities, and upon removal, with his symptoms worsening, he will become even more of a target as he has been. What if I were to conclude that there's very little likelihood of this same gang going after him that took his property now that they've succeeded in taking it, and if I were to conclude that the mistreatment he suffered, including being beaten by the board on his bare behind and so on, did not rise to the level of torture? It was mistreatment but not torture. What's the likelihood, how do you show likelihood of torture specific to him in the future? Your Honor, as I see that I'm running low on time, may I briefly answer your question? Please, yeah. So I'd like to point out to the Court that past torture is only one form of evidence that is relevant to the likelihood of future torture, which is the main inquiry of the Court. You're correct on that, I agree with you. So we know here from the expert report that Mr. Leleon has current schizophrenia. We know that upon removal that schizophrenia will worsen. And we know from the country conditions evidence that police and other authorities in Mexico force individuals with mental disabilities into public psychiatric institutions, especially when they are on the streets exhibiting these exact symptoms that the expert has testified on. So because he cannot navigate a normal life, he has no money, resources, or family in Mexico, he will be placed in an institution. And if he's not in an institution in Mexico, he will remain on the streets and be victimized as he has been before by these same groups or other groups. And how does that differentiate him from other people in Mexico who suffer from comparably severe schizophrenia? And if it does not differentiate him individually from others who have the same degree of schizophrenia, does that mean that all Mexicans with that degree of schizophrenia are sufficiently likelihood to be tortured that they would be entitled to care relief? Mr. Leleon has been persecuted. Whether or not that amounts to past torture, it was on the basis of his disability, and that is evidence that needs to be considered in analyzing the likelihood of his future torture. And because he has been individually persecuted, we know that it will happen again. It is nearly certain that it will happen again. And if it does not happen by these groups, he will be homeless with mental illness and with severe symptoms of his schizophrenia. And we know that the evidence states that police authorities place individuals such as him who are exhibiting these symptoms into public psychiatric institutions. And the evidence just shows that these institutions are plagued with severe torture. So if it is not in the public psychiatric institutions, it will be from other groups. And I'd like to also remind the court that Mr. Leleon must prove, must meet his burden by establishing that the probability he will be tortured exceeds 50%, which he has sufficiently done so here. Okay, thank you. Thank you. Thank you. Coffman. Good morning, Your Honors, and may it please the Court, I am Jane Coffman, and I will be addressing the Immigration Court's erroneous particularly serious crime determination. The Immigration Court applied the law incorrectly in determining that Mr. Leleon had committed a particularly serious crime. While the judge purportedly applied the Francesco factors, in reality, she applied a per se rule, which the law makes clear does not apply here. Had the court accurately applied the law and not imposed... How can you say in reality? She said she was applying the Francesco factors, so we're supposed to think that she wasn't? Yes, I think it's important to look at the language she uses. She's not, she's, well, I have two things to say about that. First, she's not actually musing about the legal framework of U.M. She says, quote, such crimes are inherently particularly serious as notified by the Board of Immigration Appeals in matter of U.M. She says the court concurs with the analysis of board, of the board in matter of U.M. So she's adopting this legal framework. She's not just musing about what's happening in U.M. And regardless of whether this court believes that this legal framework was adopted, she wasn't supposed to be musing about drug crimes generally. If she really was doing a Francesco factor analysis, this would have been a case by case analysis, not musing about drug crimes generally. She would have looked very seriously at this case specifically, not make a categorical determination. And I think it's really important to recognize this legal error if we take a step back here because this particularly serious crime determination is a bar to other forms of relief. And so she So what, what was it about the particular circumstances of this case that she should have considered but didn't? Well, Your Honor, she would have looked more closely at the nature of the crime. It was a low-level drug crime. It was not violent. It was not a crime against a person. It was over 25 years ago. Mr. Loya Leon was really young. She doesn't really discuss that. She just discusses that drug crimes are inherently particularly serious. Well, she did. I mean, she did say, maybe I don't know if this is getting exactly to what you're asking or you're talking about, but that he had failed to submit any independent evidence apart from the conviction records and his own declaration to shed any light So the points that you just mentioned, are those things that he urged the IJ to take account of in assessing the offense? Yes. Before, well, before the IJ, during all the hearings, they talked about that very specifically. I don't know why there was not more in the record to the extent that it was discoverable. If it was that detrimental, the government could have also put it in the record. But our position is that we have met the burden here. Those facts are specific enough to determine that the crime was not particularly serious using the Frantescu factors. And I also just want to say, to reiterate, that UM is bad law for two reasons. It arises in the aggravated felony context and this crime was determined to be a felony. But additionally, UM was based on statutory law, which was amended in 1996 to remove the per se rule. And the government concedes that UM was based on that existing statutory law. So the current withholding of removal statute, which has been the law since 1996, does not have any categorical bar for aggravated felonies with less than a five-year sentence. I also will quickly address the sentence imposed. Besides the nature of conviction facts, the sentence imposed, Mr. Loyolion got the low end of the sentence, which was 21 months. If she was really doing a case-by-case analysis, she would have looked at the 21 months. She did. I mean, that's on page 79. She notes that it's 21 months and acknowledges that that's a small share of the maximum penalty possible. So how she weighs that factor against the other factors is not something that we get to review. But we do need to make sure that she considered it, but it seems like she did. Why do you think she didn't consider that? She doesn't fully consider it. She considers it in the context of the 10 years, but she seems to be justifying why she's making this per se determination. And she actually discusses the 10 years as the reason she makes that finding. She says it's the maximum of 10 years that makes this particularly serious. Although she does mention the 21 months, she's not actually discussing what 21 months means. And we do know that this was the lowest end of the sentence. That's in the record, that the range of the sentencing for the low end was 21 to, I think, 27 or 29 months out of the 10-year maximum sentence. And I do see that my time is up, Your Honors. Thank you. Thank you. Mr. Ugamori. Good morning, Your Honors. May it please the Court. My name is Kosei Ugamori, and I This petition for review should be denied for two reasons. First, the Board properly exercised its discretion in concluding that Petitioner's cocaine delivery conviction constituted a particularly serious crime. Second, the evidence does not compel the conclusion that the Petitioner will more likely than not be tortured by or with the acquiescence of a public official or person acting in an official capacity in Mexico. Why is this discretionary under current case law? I mean, I understand that we've said that. It doesn't make a lot of sense. I mean, there are standards, and I don't know why it's discretionary. I don't know that it matters here, but it's a disturbing notion given the Supreme Court's recent case law about mixed questions of law and fact. You'd think that this was a reviewable decision based on ascertainable standards, no? I believe particularly serious crime may be distinguishable from perhaps what Your Honor might be thinking of as hardship in another context. Particularly serious crime is... It's more so, because this is not a discretionary. This ends up making the person ineligible for withholding an asylum, and there is a it is... Seems to be a more ascertainable standard than with regard to extremely unusual hardship. Well, it's probably not worth taking up our time with this argument, but it does trouble me that we continue to say this as to a really central legal question in these cases as to whether somebody's completely ineligible for asylum and relief, not simply discretionarily denying it. Understood, Your Honor. I believe the factors are set forth as guidelines, but there is not a clear legal definition as similar in the hardship context. Well, there actually is historically, but that's another question. Go ahead. Okay. Yes. So, in this case, the Board and the immigration judge both recognized that the presumption matter while did not apply, and instead applied the case. And in doing so, considered the nature of the case, the facts and circumstances of the case, as well as the actual sentence imposed. And having done so, the Board, having applied the proper framework, having considered the proper factors, and having considered the proper evidence, there is no abuse of discretion, and this Court should deny the petition for review as to the particularly serious crime determination. On Petitioner's application for CAT, the Petitioner alleges three sources of torture in this case, one by medical staff, the other by criminals, and the third by security officials or police. Now, as far as Petitioner has alleged prior harm in connection with his claim of harm by criminals and police officers, the immigration judge found that Petitioner's allegations of past harm were not reliable. That is... One of the reasons the I.J. found they were not reliable was that the I.J. found inconsistencies between the interview and the declaration. I don't think that's supportable. For example, the I.J. said, with respect to the declaration, he doesn't mention that he was recruited. Well, that's wrong. He did say that in the declaration. He did, Your Honor. So the I.J. is just wrong in finding that inconsistency between the two. Well, the I.J. did not make a firm finding that there was an inconsistency. The I.J. said there appears to be, in the sense that the narrative isn't entirely different. He's either targeted because he has a bionic eye, or he's targeted mainly because of his land. Those are separate narratives, Your Honor. I understand that, but as to the factual narrative, not the delusionary, you know, voices and so on, the I.J. says it's inconsistent, and that's for the I.J. an additional reason not to believe it. But the I.J. is just wrong on that point. Well, but the I.J. did not make a firm finding there. What the I.J. said was that it appears inconsistent, and even if it was not, the immigration judge specifically says, even if there was not a discrepancy, that he would give full evidentiary weight to the expert's evidence. But he, meaning that he was going to understand the expert's evidence as being that Loyal Leon was completely unreliable as to any factual statement he made, which is not what the expert said. Well, the expert Not what the expert said. The expert, what she said is he may need more time to respond to questions or to be asked questions repeatedly so as to mitigate the impact that antipsychotic sedation is having on his ability to recall events from his life and his ability to concentrate for both short and extended periods of time. And then she says, you know, all the stuff he's saying about auditory and visual hallucinations are obviously not true, and so therefore he is, packs his ability, let's see, he says, essentially, he says that he is impaired in his understanding of what happened because he's relying on these hallucinations. But she doesn't say that if he said that X event occurred, that he's unreliable about that. I mean, I just think he completely overread this in terms of reading the defendant as entirely not to be believed as to anything he said, as opposed to not to be believed as to whether the reason that people wanted to recruit him was because he had special ability to, you know, hear voices or something. That could be a plausible reading, but the immigration judge found that the No, no, that could be a plausible reading. That is an accurate reading of what Ms. Gullo said. I'll read one more passage just to supplement what Judge Berzon said. She writes, while he may not have been recruited by members of organized crime for his special abilities to hear the thoughts of members of the U.S. government, as a kind of a delicious understatement, I'm on 299 at the bottom, he was likely threatened with death, robbed and fired consistently due to the visible symptom of his mental illness while in Mexico by a wide range of people, some of whom may have been involved in organized crime. I mean, that's just another passage that supports what Judge Berzon said. There's not a question of may have, as Gullo may have said. That's exactly what she wrote. Yes, that he was likely threatened, not that he was, Your Honor. Does she have any independent knowledge of what happened to him in Mexico? She does not, Your Honor. And if some of what he reports are, you know, a product of hallucination and some are not, did she say that she had any basis for knowing which ones were which? What she says is that he is delusional, that he cannot provide a consistently coherent account of the past, and that he has trouble with memory. And what the immigration judge found was that the expert supports his finding that his claim of past harm is unreliable, which, by the way, is consistent with the safeguards that were in place in this case. The petitioner's counsel himself below had restricted the petitioner's testimony to just forward-looking matters because he was unreliable as far as recalling past events. Even petitioner's own written declaration begins with an opening that talks about his memory and how he can't recall past events. So everything in this case was telling the immigration judge that what happened to the petitioner in Mexico after he had begun having these symptoms were not reliable. And the immigration judge's finding as to that is supported by substantial evidence. The evidence must compel the contrary conclusion, and the petitioner has not pointed to evidence that would do so, Your Honor. And absent evidence of reliable information as to what happened to him in the past, his case essentially boils down to country conditions evidence. And as Your Honor has noted, there is no country conditions evidence in this case that compels the conclusion that petitioner has a particularized threat of torture in Mexico. There is, as far as I understand from the record, no evidence about how the criminal organizations would treat mentally ill persons. There's sparse evidence about how the police treat mentally ill persons, much less the frequency with which they do so. And so the evidence would not compel the conclusion in his favor. Your first statement was there's no evidence that what? Secondly, you said there's sparse evidence about how the police treat, but what was the first sentence you said? It was of how criminal organizations treat mentally ill persons. And petitioner has not cited any country conditions evidence that would compel a finding, let alone shed light on how criminal organizations treat mentally ill persons in Mexico. And the petitioners also allege a third claim, which is fear of harm by medical staff. And here again, the evidence does not compel the conclusion in his favor. The petitioner was equivocal about whether he would seek medical attention in Mexico, and the immigration judge was within his discretion to find that he would not seek medical attention in Mexico, given the fact that he doesn't believe he is sick. He said he's not going to take medication, and those are facts that are substantially supported. And furthermore, the expert herself, I believe this is at page 300 of the administrative record, says that because the petitioner has such poor insight into his mental illness, it is not likely that he will seek medical attention in Mexico without outside support. So all evidence points here that the petitioner would not seek medical attention in Mexico, and if he's not going to seek medical attention in Mexico, then his claim that he would be tortured in a mental health facility falls apart. Well, the expert's view was that as he walks around saying all this stuff, he is going to be perceived as mentally ill, and because he's not going to seek treatment, he's going to continue to do that, and he's therefore going to be either incarcerated or sent to a mental institution. So it should be noted here that the petitioner's expert was qualified. This is at page 216 of the administrative record. It was qualified on mental illness and symptoms of a person suffering from mental illness, not on country conditions. But her point was that because of his symptoms, he was going to be obvious as to his mental illness. Yes. To anybody he ran into. Right, right. The expert did say that he has a tendency to share his delusional thoughts with others. That is correct, Your Honor. But that is separate from saying that because of that, you know, how he would be treated in a certain country, she has no expertise in Mexico. One can imagine that this is not a universal matter. People with mental illnesses with publicly open symptoms might be treated differently based on the country. So it's not universal that just because somebody shows symptoms of mental illness that they would be subject to some type of enforcement or involuntary commitment. I suppose that he were to be institutionalized. There seems to be a fair amount of evidence that conditions in Mexican mental institutions are, put it mildly, not up to the standards of what we would expect in this country. Is there any evidence that any of that treatment is specifically intended to inflict severe physical or mental pain or suffering? The government would submit that there is no compelling evidence in that regard. And we would agree that the conditions are deplorable. But as this Court and the Board has recognized, specific intent is a required element of CAP protection. And unless there is a specific intent to harm, to cause pain and suffering, the petitioner cannot establish eligibility for CAP protection. And here the record contains many instances of reports of medical staff, well-meaning medical staff, that's how they're described, well-meaning medical staff, who are simply overwhelmed and lack the budget, training, and education to give sufficient care. I see that my time is expiring. May I briefly conclude? You still have... Oh, I'm sorry. I thought that was going. No, no, you're good. Okay. I see. Right. So it should be noted here that the petitioner, in their brief, really only cite to a handful of articles. And most of those articles are actually in favor of the government. The DRI report from, I believe, 2015, the DRI report from 2010, and also the 2018 article that they submitted, all of that actually shows that hospital staff, the reason why they can't provide sufficient care is because there is not sufficient budget funding or training. So the point is, if petitioner does not, and as this Court should uphold, there is substantial evidence showing that petitioner's past claims are unreliable, then the country conditions evidence itself, as shown by petitioner's citation to them, is simply insufficient to compel the conclusion in their favor. Now, in sum, the Board did not abuse its discretion in this case. The particularly serious crime determination is supported by an application of the proper legal framework, the proper factors, and consideration of proper evidence. And furthermore, the petitioner has not alleged a colorable, legal, or even sufficient factual challenge to the Board's denial of torture protection, where he has not established that the evidence compels the conclusion in his favor, that he would more likely than not be tortured in Mexico. And for those reasons, the government requests that this Court deny this petition for review. Thank you. Thank you. Petitioners, I believe you have two minutes remaining. Your Honor, this is a severely unique case requiring this Court to protect this petitioner's rights. This is a case plagued with legal error. The IJ used Mr. Lerleon's schizophrenia as a sword and a shield in denying his CAT application. She held his mental illness against him when it came to reliability by discounting vital evidence in the form of expert testimony. I'd like to remind the Court that the Ninth Circuit has routinely held that expert testimony that is improperly rejected is legal error and thus per se reversible. The IJ also failed to consider his mental illness when deciding the likelihood of We have the observation that at least some of what the expert was justifying seemed to be based on country conditions in Mexico in which he was not an expert. That's correct. The expert was not an expert in country conditions but rather mental disability, and that is precisely what she testified on. She testified on Mr. Lerleon's mental illness and the likelihood that upon removal to Mexico, that mental illness will worsen. Additionally, the IJ didn't conduct the proper aggregate analysis by considering that expert testimony that his symptoms will worsen in conjunction with the country conditions evidence that shows that he will certainly be institutionalized. The Court also conducted legal error by tainting the analysis without a thorough analysis resulting in great harm for the particularly serious crime determination. And for these reasons, this Court should remand for the immigration courts below to engage in the proper analysis and consider the entirety of the evidence before it as required by law. Can I ask you to go back just a moment? You said he's likely to be institutionalized. What's your answer to the government's observation that even if Mexican mental institutions  constitute torture, that it's not specifically intended to inflict pain and therefore doesn't meet the statutory definition? Meeting the standard for a specific intent does not require actual knowledge. Meeting the standard for a specific intent is met where the record demonstrates that public officials at any level would acquiesce in torture, and that's precisely what has been done here. These psychiatric institutions are publicly run, and the Mexican government is aware that these institutions are plagued with abuse and torture, yet nothing has been done to stop the abuse and torture within these institutions. Your Honors, if there are no further questions, thank you so much. Thank you. Thank you, Ms. Boyajian and Ms. Kaufman. You're appearing by appointment of the Court pro bono. Thank you for your service. We thank all counsel for their arguments this morning. The case is submitted, and we are adjourned. All rise. This Court for this session stands adjourned.
judges: FLETCHER, BERZON, MILLER